IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 5, 2014

**STATE OF TENNESSEE v. SAIDRICK TIWON PEWITTE**

**Appeal from the Circuit Court for Madison County**
**No. 12519     Donald H. Allen, Judge**

---

**No. W2013-00962-CCA-R3-CD  - Filed March 25, 2014**

---

A Madison County Circuit Court jury convicted the Defendant-Appellant, Saidrick Tiwon Pewitte, of possession of .5 grams or more of cocaine with the intent to sell; possession of .5 grams or more of cocaine with the intent to deliver; possession of a Schedule III controlled substance (dihydrocodeinone) with the intent to sell; possession of dihydrocodeinone with the intent to deliver; and possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony. See T.C.A. §§ 39-17-417, -1324 (2011). He received a total effective sentence of twenty-eight years in the Department of Correction. The sole issue presented for our review is whether the evidence is sufficient to support the convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

George Morton Googe, District Public Defender; Gregory D. Gookin, Assistant Public Defender, Jackson, Tennessee, for the Defendant-Appellant, Saidrick Tiwon Pewitte.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case arises from the execution of a search warrant at the residence of the Defendant-Appellant, Saidrick Tiwon Pewitte, in Jackson, Tennessee. As a result of the search, the Madison County Grand Jury returned a six-count indictment charging the Defendant with the possession of cocaine and of painkillers with the intent to sell or deliver,

and the possession of a gun with the intent to go armed during the commission of or attempt to commit a dangerous felony.[1] The following proof was adduced at trial.

**Trial.** Investigator Samuel Gilley of the Jackson Police Department Gang Enforcement Team testified that he served a search warrant on the afternoon of October 5, 2011, at the Defendant's home. The Defendant was listed as the subject of the search warrant. Curtis Goyer and Christian Ellison were observed to enter the home immediately prior to the search. The police knocked on the front door, announced their presence, and forcibly entered when no one answered the door. Investigator Gilley said seven or eight officers were involved in executing the search warrant and that he was the last one to enter the residence.

Investigator Gilley described the layout of the residence and said the police focused their investigation on the far left side of the house. This room, previously a garage or carport, had been remodeled into a bedroom with a front door. Investigator Gilley explained that from this room, two or three small steps lead into the kitchen and the main part of the house. Upon his entry through the front door into the remodeled garage, Investigator Gilley observed that Mr. Goyer had been detained "just inside" the door. The Defendant was in this room sitting on his bed. Mr. Ellison was detained on the small staircase that led into the kitchen. Investigator Gilley stated that apart from law enforcement, these three men were the only people in the house. After the scene was secured, the police took the men outside to the front yard and executed their search of the residence.

During the search, Investigator Gilley observed the following:

> One of the first things that I readily recognized [were] two bags of cocaine that were wrapped individually. Both of them had an approximate field weight of half a gram each. They were on the nightstand in that bedroom . . . that we came in where [the Defendant] was in bed. Directly next to his bed was a nightstand and on top of it were those two bags of cocaine. There was also a clear plastic bag that had nine Lortab pills and three Vicodin pills. This was in a -- tied up in like a sandwich baggy. There was a blue bag that kind of was on the stairs like going from that bedroom area up to the kitchen that had digital scales, some spoons, some plastic bags that had like the corners twisted off. Some of the items had the white powdery residue. There was also an open box of the same type of sandwich bags that the cocaine and the pills were packaged in on the nightstand.

---

[1] A count for employing a firearm during the commission of a dangerous felony was dismissed upon motion of the State.

-2-

. . . .

There was another bigger bag found inside the kitchen cabinet and I was informed to come over and have it photographed and collected. It was a larger sandwich bag that contained two other individual packages of cocaine. One was approximately 37.4 grams and the other was approximately 13.2 grams.

Investigator Gilley collected the evidence retrieved from the Defendant's residence which included two large bags of cocaine recovered from a kitchen cabinet and two small bags of cocaine and a bag of painkiller tablets recovered from the bedroom nightstand. A blue bag containing a digital scale, two spoons, and three twisted plastic bags inside the blue bag was recovered from the steps leading to the kitchen. Investigator Gilley noted, "These are baggies that have been twisted and had the corner twisted torn out of them. I mean, definitely the metal spoon and these baggies have white powdery residue on them . . ."

Investigator Gilley said law enforcement also found "a loaded .38 revolver" in the drawer of the same nightstand from where the two smaller cocaine bags and pills were recovered. Inside the nightstand drawer, there were some bullets and a wallet with $667 in cash and the Defendant's Social Security card. There was also a holster and a piece of mail addressed to the Defendant at this residence. Investigator Gilley identified these items at trial. He further identified the box of sandwich bags seized from on top of the nightstand. The police also seized a plastic bag containing twenty-seven rounds of ammunition for a .38 caliber revolver from the Defendant's bedroom cabinet. Near these bullets, there was a Crown Royal bag containing $1,395 in cash. The police seized a total amount of $2,062 in cash from the Defendant.

On cross-examination, Investigator Gilley testified that Mr. Goyer and Mr. Ellison saw the police and "hurried" into the house. He said the Defendant reported having knee problems and required assistance from a wheelchair when the police took him out of the residence.

Christopher Wiser testified that he was a lieutenant with the Jackson Police Department Special Operations Division and the commander of the Gang and K-9 Units. During the search of the Defendant's residence, Lieutenant Wiser explained a rights waiver form to the Defendant and Mr. Goyer. Both men signed the form, which was entered into evidence. Lieutenant Wiser said he interviewed Mr. Goyer at the scene and that the Defendant was the person of interest in the investigation.

Sergeant Phillip Kemper of the Jackson Police Department Gang Enforcement Team testified that he interviewed and took a statement from the Defendant during the search of the residence. He identified the Defendant's formal adopted statement, which was admitted into evidence without objection. Sergeant Kemper read the Defendant's statement into the record, which contained, in pertinent part, the following:

> The powder and pills on the table by my bed belonged to me because I am in a lot of pain and I have a drug problem. The gun that was in the table by my bed was mine. I have had it for about six months because some bad things have gone on in my neighborhood and I'm home by myself a lot and disabled and need protection. My wallet was in there too. I think it had about $650 or so cash that was my disability check. If there was anything else illegal in that house, I do not know about it or where or how it got there. I accept responsibility for what little dope is mine because I am in pain and I have a drug problem. I only have the gun because I was disabled and needed protection.

Brenda McNeil, the evidence custodian for the Jackson Madison County Metro Narcotics Unit, received the following evidence pertaining to the instant case: four bags of cocaine weighing approximately 37.4 grams, 13.2 grams, 0.5 grams, and 0.5 grams, respectively; a plastic bag with nine Lortab pills and three Vicodin pills; and "a blue bag with a black digital scale, two spoons and three bags with the corners torn off" as well as an open box of sandwich bags. Ms. McNeil transported the narcotics to the lab for testing. Ms. McNeil said she was the only person who had custody of the items.

Special Agent Shalandus Harris, a forensic scientist with the Tennessee Bureau of Investigation (TBI) Memphis regional lab, testified as an expert witness in the field of drug analysis and identification. In this case, she received and examined the contents of three plastic bags. Agent Harris performed a color test and an instrumental analysis and determined the substance in the first bag to be cocaine with a weight of 48.04 grams. She did not test the second bag because the statutory weight requirement for cocaine had already been met, with the next cutoff being 300 grams. The third plastic bag contained various tablets which she tested separately. She identified three different types of tablets based on their color and markings. After an instrumental analysis, she found that the tablets tested positive for hydrocodone, a Schedule III controlled substance. She determined the brand names of the tablets to be Lortab and Vicodin. Agent Harris generated an official forensic chemistry report, which was admitted into evidence.

Investigator Rodney Anderson of the Jackson Police Department Gang Unit testified that he took several photographs of items found at the scene of the Defendant's residence

during the search. He individually identified the photographs, which were entered as a collective exhibit without objection. He said the photographs accurately depicted what he observed at the residence on the day in question.

Christian Ellison, the Defendant's cousin, testified that his aunt, uncle, their grandchildren, and the Defendant lived at the residence that was searched on October 5, 2011. On that day, Mr. Ellison said he and his uncle, Curtis Goyer, returned to the house at around 1:15 or 1:30 p.m. after a job. When Mr. Ellison went outside "to water the dog," he saw the police arrive. At that point, he "took off into the house" to tell his cousin that the police were outside. He said he alerted the Defendant because he knew his cousin "was using drugs and stuff like that." When Mr. Ellison entered the front door into the remodeled garage, he saw the Defendant on the bed and Mr. Goyer seated on the couch. He said that "everything happened so fast" by the time the police entered the home. According to Mr. Ellison, when he told the Defendant about the police, the Defendant threw a purple Crown Royal bag at him. He said he was on the small staircase at the time and that the bag hit him in the chest and fell onto the steps. A white compact substance fell out of the bag onto the floor along with some bags and a scale. Mr. Ellison stated that he did not know what to do and that he grabbed the drugs and "threw them in the cabinet." The bag and other items were "still on the steps where [the police] found it." He said he moved the drugs because he was scared and because he wanted to help his cousin. He stated that the drugs and other items did not belong to him. Mr. Ellison said that the Defendant had knee surgery and was taking pain medication and that the Defendant had been confined to the hospital bed in his room for months.

Curtis Goyer testified that he was the Defendant's stepfather and that he had lived in the residence in question for thirty years. He said the Defendant had stayed at his house for four or five years. According to Mr. Goyer, the Defendant had fallen a few months before the search and had torn the muscles in both legs. After the fall, the Defendant had surgery and stayed on a hospital bed in the den. On the afternoon of October 5, 2011, Mr. Goyer and the Defendant were in the den reading their mail when Mr. Ellison told them the police were outside. Mr. Goyer said he saw the police in front of his house with shotguns, but he did not see any interaction between his nephew and the Defendant. Mr. Goyer said that before returning to the house, he had been staining a fence with his nephew since around 9:00 a.m. and he did not see Mr. Ellison with any drugs.

Mr. Goyer testified that he was not aware of drugs in his house on the day of the search. He said he had previously observed the Defendant use small packets of cocaine on at least two occasions, but he had never seen cocaine in the amount recovered by the police. Mr. Goyer knew that the Defendant had a revolver, which he said the Defendant had obtained after his injury. He said both he and the Defendant kept money locked in the kitchen cabinet.

Mr. Goyer stated that the Defendant received a monthly disability check of "$800 or $900." He also reported that the Defendant had obtained a loan of about $1,500 a few months before the search and that he had taken the Defendant to the bank to apply for and accept the loan. He said that the Defendant had limited mobility and that he took the Defendant "to the bank and to the doctor and to do exercise and stuff like that in a wheelchair." He was also aware that the Defendant took "lots of medication." Mr. Goyer said he and his wife did not use any drugs apart from prescribed medication.

The Defendant chose not to testify and did not present any proof at trial. Based on the above proof, the jury convicted the Defendant as charged on all five counts and assessed a fine of $5,000 for each count.[2] At a subsequent sentencing hearing, the trial court merged the narcotics offenses into one count of possession of .5 grams or more of cocaine with the intent to sell and one count of possession of a Schedule III controlled substance with the intent to sell. For his three felony convictions, the Defendant was fined a total of $15,000. The trial court sentenced the Defendant as a Range II, multiple offender to twenty years' imprisonment for the cocaine offense and eight years for the dihydrocodeinone offense. For the firearm offense, the Defendant was sentenced to eight years, to be served consecutively to the underlying dangerous felony of possession of cocaine with the intent to sell. See T.C.A. § 39-17-1324(e)(1). The Defendant received an effective sentence of twenty-eight years in the Department of Correction. After the denial of his motion for new trial, this timely appeal followed.

**ANALYSIS**

**I. Sufficiency of the Evidence.** On appeal, the Defendant argues that the evidence was insufficient to support his convictions. Specifically, he contends that the State did not present any proof to establish that he was selling either cocaine or hydrocodone.[3] He also asserts that although the State established that he possessed a gun, "[n]o additional proof was adduced to show that [the Defendant's] purpose for having a firearm was to further his possession of cocaine with intent to sell/deliver." The State responds that there was ample evidence to support the convictions. We agree with the State.

---

[2] Specifically, the Defendant was convicted of possession of .5 grams or more of cocaine with the intent to sell, a Class B felony; possession of .5 grams or more of cocaine with the intent to deliver, a Class B felony; possession of dihydrocodeinone with the intent to sell, a Class D felony; possession of dihydrocodeinone with the intent to deliver, a Class D felony; and possession of a firearm with the intent to go armed during the commission of a dangerous felony, a Class D felony.

[3] We note that "hydrocodone" and "dihydrocodeinone" are used interchangeably in the record and in the parties' briefs. See also T.C.A. § 39-17-410 (identifying "dihydrocodeinone (hydrocodone)" as a Schedule III controlled substance).

We begin our analysis of this issue by recognizing well established law concerning an appellate court's review of the sufficiency of the evidence. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686,

689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

The Defendant was convicted of possession of .5 grams or more of cocaine with the intent to sell or deliver, possession of dihydrocodeinone with the intent to sell or deliver, and possession of a firearm with the intent to go armed during the commission of a dangerous felony. To sustain a conviction for the possession of cocaine with the intent to sell or deliver, the State was required to prove beyond a reasonable doubt that the Defendant knowingly "possess[ed] [cocaine] with intent to manufacture, deliver or sell [cocaine]." T.C.A. § 39-17-417(a)(4) (2011). A violation of subsection (a) with respect to .5 grams or more of cocaine is a Class B felony. Id. § 39-17-417(c)(1). Similarly, to sustain a conviction for the possession of dihydrocodeinone with the intent to sell or deliver, the State had to prove that the Defendant knowingly "possess[ed] [dihydrocodeinone] with intent to manufacture, deliver or sell [dihydrocodeinone]." Id. § 39-17-417(a)(4). A violation of subsection (a) with respect to a Schedule III controlled substance is a Class D felony. Id. § 39-17-417(d)(1). The possession of a firearm with the intent to go armed during the commission of a dangerous felony is a Class D felony. Id. § 39-17-1324(a), (g). The possession of cocaine with the intent to sell or deliver is considered a "dangerous felony." Id. § 39-17-1324(i)(1)(L).

In challenging the sufficiency of the convicting evidence, the Defendant contends that the State failed to establish the elements of intent to sell the cocaine or the painkillers. He argues that the proof demonstrated that he was merely a user of cocaine and pain medication. To support this claim, he points to the testimony of Mr. Ellison and Mr. Goyer establishing that the Defendant used cocaine and painkillers due to a prior surgery. He maintains that the proof showed that the source of his money was a recent loan and his disability check. The Defendant asserts that "the criminal conduct ultimately involves Ellison running into the house, running up the stairs to the kitchen, and hiding a large amount of cocaine from law

enforcement." Regarding the firearm offense, the Defendant argues that the proof established that he possessed a revolver for his own protection and that the State failed to prove that he had the intent to go armed while possessing cocaine with the intent to sell or deliver.

Viewed in the light most favorable to the State, the evidence presented at trial was sufficient to sustain each of the Defendant's convictions. The proof regarding intent in this case, as in most cases, was largely circumstantial. However, in light of Investigator Gilley's testimony regarding the packaging of the drugs and the amount of cocaine that was found, the jury could reasonably infer that the cocaine and the painkillers were for resale. See T.C.A. § 39-17-419 (2011) ("It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing."). Such "other relevant facts" that can give rise to an inference of intent to sell or deliver include the absence of drug paraphernalia, the presence of a large amount of cash, and the packaging of the drugs. See State v. Belew, 348 S.W.3d 186, 191-92 (Tenn. Crim. App. 2005) (citing State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) (finding sufficient evidence to support the jury's finding of intent to deliver when the defendant possessed 1.7 grams of crack cocaine, no drug paraphernalia, and 5.1 grams of baking soda); State v. Logan, 973 S.W.2d 279, 281 (Tenn. Crim. App. 1998) (finding sufficient evidence of intent to sell to support conviction when the defendant possessed a large amount of cash and several small bags of cocaine); State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (finding that the absence of drug paraphernalia and the manner of packaging of drugs supported an inference of intent to sell); State v. William Martin Frey, No. M2003-01996-CCA-R3-CD, 2004 WL 2266799, at *8 (Tenn. Crim. App. Oct. 6, 2004) (finding that testimony of 1.8 grams of cocaine, a "stack" of cash, and absence of drug paraphernalia constituted sufficient evidence to support the jury's inference of intent to sell), perm. to appeal denied (Tenn. Feb. 28, 2005)).

Here, the Defendant maintains that the drugs were for his personal use. However, law enforcement recovered one package of cocaine weighing over 48.04 grams, an open box of sandwich bags in a nightstand in close proximity to cocaine and painkillers, a digital scale, and spoons and plastic bags with "white powdery residue" on them. The police also found plastic bags with the corners torn off. Investigator Gilley testified that based on his training and experience as a narcotics investigator, he determined that the spoons, scale, and plastic bags were used to measure, weigh and package drugs. He also testified that drugs are generally packaged in a corner of a sandwich bag, which is then twisted, tied, and torn off. He said that the drugs recovered from the Defendant's residence were packaged consistent with this manner. Because the sandwich bags were found on a nightstand next to cocaine

and painkillers, rather than in the kitchen, the jury could reasonably infer that the Defendant used the plastic bags in furtherance of the resale of cocaine.

Additionally, TBI forensic scientist Agent Harris testified that she examined three different types of dihydrocodeinone tablets. The police recovered the Vicodin and Lortab pills in a plastic bag near cocaine, sandwich bags, and a firearm rather than in a prescription bottle consistent with a theory of lawful possession. Photographs taken by Investigator Anderson showed that the Defendant had a wallet full of cash in his nightstand drawer next to a loaded weapon and two cell phones in his bedroom. Furthermore, a total of $2,062 in cash was seized from the Defendant. Mr. Ellison testified that the Defendant threw a bag containing drugs and a scale and other items at him when the police arrived. He testified that the drugs did not belong to him. Mr. Goyer testified that he did not see Mr. Ellison with any drugs while they were together. Here, the jury considered the evidence and resolved all apparent inconsistencies in favor of the prosecution's theory, finding that the Defendant did in fact possess cocaine and pain medication for resale. Although the Defendant argues that he was merely a drug user, it is the prerogative of the jury to weigh and evaluate the evidence. This court does not resolve questions of witness credibility and factual issues, nor do we re-weigh or re-evaluate the evidence. See State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003) (citing Bland, 958 S.W.2d at 659). We also decline to substitute our inferences for those drawn by the trier of fact. See State v. Ross, 49 S.W.3d 833, 845 (Tenn. 2001) (citing State v. Pike, 978 S.W.2d 904, 914 (Tenn.1998)). Accordingly, we conclude that there was sufficient evidence to find that the Defendant possessed cocaine and dihydrocodeinone tablets with the intent to sell or deliver.

Furthermore, the evidence was sufficient for a reasonable juror to find the Defendant guilty of possession of a firearm with the intent to go armed while possessing cocaine with the intent to sell or deliver. "[T]he necessary intent to support a conviction for carrying a weapon with the intent to go armed may be proved by the circumstances surrounding the carrying of the weapon." Cole v. State, 539 S.W.2d 46, 49 (Tenn. Crim. App. 1976). "It is no defense that a defendant has armed himself solely for the purpose of self-defense." Taylor v. State, 520 S.W.2d 370, 371 (Tenn. Crim. App. 1974) (citing Coffee v. State, 72 Tenn. 245). "[T]he plain language of subsection (a) does not evidence a legislative intent to differentiate between lawful or unlawful possession of a firearm." State v. Samuel Alan Ireson, No. E2010-01648-CCA-R3-CD, 2011 WL 2410322, at *6 (Tenn. Crim. App. June 10, 2011), perm. to appeal denied (Tenn. Sept. 21, 2011). The purpose of going armed should be determined from the facts of each particular case. Hill v. State, 298 S.W.2d 799 (Tenn. 1957).

Here, the proof established that the police discovered a loaded .38 caliber revolver in the Defendant's nightstand drawer next to a holster and a wallet with $667 in cash. On top

of the nightstand, the police recovered an open box of eighty-count sandwich bags, two small packages of cocaine, and a plastic bag with twelve Vicodin and Lortab pills. In the bedroom cabinet, there was a plastic bag with twenty-seven rounds of ammunition for a .38 caliber revolver. Near these bullets, the police also seized $1,395 in cash in a Crown Royal bag. Based on the evidence presented at trial, a rational trier of fact could find the Defendant guilty of possession of a firearm with the intent to go armed during the commission of a dangerous felony. See also State v. Demario Darnell Thompson, No. W2012-00642-CCA-R3-CD, 2013 WL 3776985, at *10 (Tenn. Crim. App. July 15, 2013) (finding that proof of a loaded gun in the glove box within the defendant's reach constituted sufficient evidence to support a finding of the specific intent to go armed during the sale of marijuana), perm. to appeal denied (Tenn. Nov. 13, 2013); State v. Ronnie Paul Trusty, No. W2012-02445-CCA-R3-CD, 2013 WL 3488150, at *4 (Tenn. Crim. App. July 11, 2013) (finding sufficient evidence to establish the intent to go armed where law enforcement found a holstered and loaded .38 caliber handgun in a locked bedroom cabinet next to a bag of marijuana, sandwich bags, and scales), no perm. to appeal filed.

Based on the evidence presented at trial, a rational trier of fact could have found beyond a reasonable doubt that the Defendant was guilty of each of his convictions. The jury was responsible for weighing and evaluating the evidence and to make reasonable inferences based on the proof. We conclude that the evidence was sufficient to sustain the Defendant's convictions. Accordingly, he is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE